630 So.2d 1378 (1994)
Mark Thomas SPURRELL, Plaintiff-Appellant,
v.
Grady L. IVEY, et al., Defendants-Appellees.
Mark Thomas SPURRELL, Plaintiff-Appellant,
v.
WILLIS-KNIGHTON, et al., Defendants-Appellees.
Nos. 25359-CA, 25360-CA.
Court of Appeal of Louisiana, Second Circuit.
January 25, 1994.
Rehearing Denied February 17, 1994.
*1380 Donald R. Miller, Shreveport, for appellee-appellant, Mark Thomas Spurrell.
Adams & Reese by J. Wendell Clark, Baton Rouge, for appellant-appellee, Lexington Ins. Co.
Comegys, Lawrence, Jones, Odom & Spruiell by John S. Odom, Jr., Shreveport, for appellee, Steel Erectors Inc.
Blanchard, Walker, O'Quin & Roberts by David N. Matlock, Shreveport, for appellee, McInnis Bros. Const.
Before NORRIS, LINDSAY and WILLIAMS, JJ.
NORRIS, Judge.
Mark Thomas Spurrell filed these two suits, one in tort and the other in workers compensation, for injuries sustained in an on-the-job accident. After a bench trial, the court rendered judgment on the tort claim in favor of Spurrell and against the tortfeasor, Steel Erectors Inc., and its insurer, Lexington Insurance Co., for $40,000; and on an intervention in the tort suit, judgment in favor of Spurrell's statutory employer's comp carrier, Great American Insurance Co., against Steel Erectors and Lexington, for $19,709.07 in benefits previously paid to Spurrell. On the comp claim, the court denied any further benefits over those Spurrell had already received from Great American. From this judgment Lexington appeals, urging the occurrence of Spurrell's injury was not covered by Steel Erectors' general liability policy. Spurrell also appeals, urging that both his tort and comp awards are inadequate. For the reasons expressed, we affirm.

*1381 Factual and procedural background

The plaintiff, Spurrell, was a construction worker employed by Ivey's Steel Erectors Inc., a small corporation of which Grady Ivey was the majority stockholder. Ivey's workers comp coverage had lapsed; the company later went bankrupt. Ivey, however, was working as a subcontractor for McInnis Brothers Construction Co., the general contractor on the job to build the Steen-Hall Eye Clinic, allegedly on the premises of Willis-Knighton Medical Center. McInnis was ultimately found to be Spurrell's statutory employer, and McInnis's workers comp carrier, Great American Insurance Co., remained in the litigation after McInnis itself was dismissed.
Also on the job site was a crane owned by Steel Erectors Inc. (not related to Ivey's Steel Erectors Inc.) and operated by a Steel Erectors employee, Hennigan. Steel Erectors was neither Spurrell's employer nor statutory employer. It carried general liability insurance with Lexington Insurance Co. Steel Erectors, however, had never dealt directly with Lexington, but had bought the policy from a local agency, Smith Howard & McCoy, for a premium of $44,750. Smith Howard & McCoy had, in turn, secured the policy from a broker in New Orleans, Louisiana Risk Specialists, which was authorized to bind coverage with Lexington. The policy was a "claims made" policy and required, in ¶ IA and IC, that Lexington or its insured receive written "notice of claim" within the policy period; notice of claim was also valid in an "extended reporting period" of 60 days after the policy expired. Policy, p. 10, ¶ 4a. The policy further provided, in ¶ IG, that if the insured submitted a written "notice of occurrence" to Lexington within the policy period, then Lexington would honor a notice of claim for 36 months after that date. Steel Erectors' policy with Lexington ended on July 1, 1987.
On the morning of May 1, 1987 Spurrell was tying up "rebar" to be placed in wall forms before the concrete was poured. Once the rebar is manually tied up into a "mat," it is placed in the wall form with a crane. The mat, however, would fall apart if it were lifted directly on the crane's hook, so a metal beam is kept on the hook for support; the beam must be lowered on the boom and the mat placed on the beam. The Steel Erectors crane, and its operator, Hennigan, were on the site to provide this and other services to the contractors. Before lifting this mat, Hennigan and Ivey had some words about where the crane should be placed to avoid tipping it over; their accounts differ. However, Spurrell was still bending over to tie up a mat as Hennigan swung the beam over. The beam slowly but forcefully struck Spurrell in the back. Spurrell claims he was carried along for several feet before Ivey helped him escape. Spurrell was able to get up and walk off the job site, but back pain was setting in so he went straight to his chiropractor, Dr. Allen. Spurrell alleged that he has suffered disabling pain ever since. His medical evidence will be discussed below.
As Ivey had no workers comp coverage, McInnis's comp carrier, Great American, ultimately paid Spurrell weekly benefits and medicals through November 4, 1987, totalling $19,709.07.
Steel Erectors' president, Van Griffith, was also aware an accident had occurred. He testified that a day or so after the accident, he phoned and reported it to someone, probably Nancy McDowell, at his insurance agency, Smith Howard & McCoy. He further testified that he had always reported accidents this way, and the claims had always been processed without difficulty. Smith Howard & McCoy's agency manager, Cindy LaSalle, testified that an insured could initiate a claim by phoning the agency; Smith Howard & McCoy would generate the paperwork and forward it to the insurer. She also testified, however, that she could find no record that Griffith called the agency in early May, or that she forwarded a notice to Lexington at this time. She relied on the "claims schedule" that the agency kept for each insured; this was supposed to include all activity on the account. It did not show that Griffith called in early May. Griffith assumed that his call had been properly processed and took no further action. On September 15 he received a letter from Spurrell's attorney and forwarded this to Smith *1382 Howard & McCoy. Their claims coordinator, Nancy McDowell, found that the policy had expired on July 1, and that the 60-day extension had expired on September 1; she therefore sent Griffith a letter telling him his claim was not timely. The "claims schedule" did not reflect this action, and other files which may have shown whether or not Griffith actually phoned in May had been purged.
Meanwhile Spurrell sought treatment or medical opinions from at least seven doctors. Initially after the accident Dr. Allen, the chiropractor, found a minor laceration and some swelling at L1-2. He treated Spurrell for about four days and then referred him to Dr. Brian, an orthopedist in Bossier City. Dr. Brian found Spurrell had a "stiff, painful back," but his X-ray was negative. Dr. Brian treated Spurrell regularly for about three months, and also referred him to Dr. Long, a neurosurgeon, who treated him simultaneously with Dr. Brian. Dr. Long found no evidence of a disc problem. In mid-June 1987 Spurrell went to Bossier Medical Center for a bone scan and CT scan; both were normal. At this time, Dr. Long expressed concern about Spurrell's "thinking processes." In July Dr. Brian performed another neurological exam, which was normal; he advised Spurrell to increase his activity gradually. Spurrell, however, began to show symptoms of anxiety and depression. In early September Dr. Long performed neurological tests; these were normal. Dr. Long testified that he suspected a "mild conversion reaction."
On Dr. Long's referral, Spurrell saw Dr. Osborne, a general practitioner, who performed various physical tests; all were normal. He found, however, "trigger points" that suggested fibromyalgia. He also found that Spurrell showed "more emotional difficulties than 99.9% of his peers and also showed to be a strong sensitizor or one who overresponds to stress and reacts in a greatly exaggerated fashion to prove his perceived difficulties "(emphasis added). Relying on a report from Dr. Staats, a psychologist, Dr. Osborne further found that Spurrell has "an axis 1 diagnosis of a psychogenic pain disorder, generalized anxiety disorder and despondent disorder and an axis 2 diagnosis of borderline personality disorder with prominent dependent avoiding and passive aggressive traits." Dr. Osborne felt that Spurrell should be able to return to work handling weights of 28-30 lbs. and should be released. Another physician reviewing Dr. Staats's reports, Dr. Wolfe, also reported that Spurrell could return to his former job. On the basis of these reports, Great American terminated comp benefits effective November 4, 1987.
In January 1988 Dr. Brian saw Spurrell for a final visit and released him as having reached maximum cure. He admitted, however, that Spurrell complained of "good days and bad days."
Meanwhile, Spurrell went to Dr. Burda, a rheumatologist, on referral from Dr. Osborne. Dr. Burda found tenderness in Spurrell's lower thoracic/upper lumbar area, but neurological, physical and motor tests were normal. He diagnosed "traumatic regional fibrositis soft tissue injury syndrome," and in December 1987 he advised Spurrell not to return to work. Dr. Burda admitted in deposition that organic physical problems cause some people to exaggerate their complaints, but the exaggeration is not voluntary. He also admitted that only one percent of his patients ever seek further care after their cases are settled. Dr. Burda referred Spurrell to Dr. Hayes, a psychiatrist.
Dr. Hayes saw Spurrell regularly for about eight months, and in July 1988 admitted him to Schumpert Medical Center for an MRI. "Motion artifact" was present on many of the films, obscuring the detail; however, Dr. Hayes could detect a decrease in the disc space height and slight right sided disc protrusion or mild herniation at the L4-5 disc space level. According to Dr. Hayes, Spurrell felt "vindicated" that a test finally showed something objectively wrong. Dr. Hayes saw Spurrell a few more times after the MRI; by May 1989 he felt the post traumatic stress syndrome had abated "long before."
Dr. Long, the neurosurgeon, admitted that prior to the MRI, he never suspected any disc problem. He testified, however, that with a positive MRI and negative CT and bone scans, he would like to conduct a myelogram just to "clear the water" and resolve the inconsistent tests. He also testified that *1383 Spurrell could go back to work. Dr. Osborne testified that he would not operate on Spurrell just on the basis of the MRI; he would order a myelogram to verify the bulging disc. He also admitted that mild bulging is normal for at least 40% of the general population over the age of 30. Dr. Brian corroborated this statistic. He never saw Spurrell's MRI results, but pointed out that while he was treating Spurrell, the back pain was higher, at L1-2, not at L4-5 as shown in the MRI.

Action of the trial court
After a bench trial in November 1992, the court rendered oral reasons for judgment. It found (1) that Spurrell was injured on May 1, 1987 in a work-related accident; (2) the injury was compensable under workers comp laws and in tort against various defendants; (3) that Spurrell was entitled to no further comp benefits than those already paid by the insurer; (4) that Great American was not arbitrary and capricious in failing to pay benefits timely, owing to the bona fide dispute as to the extent of injuries; (5) that Steel Erectors' employee, Hennigan, was negligent in causing the accident and his negligence was a legal cause of the accident; (6) that neither Grady Ivey nor Spurrell himself was negligent in causing the accident; (7) that Van Griffith gave oral notice of the occurrence to the agent, Smith Howard & McCoy, and this was sufficient under the latter's business practices; (8) that the notice was binding on Lexington; (9) that written notice ensued within the 36-month extended reporting period; (10) that Spurrell was "an unreliable historian" of his medical problems; (11) that he had an underlying personality disorder which manifested itself after the trauma; (12) that the only physical harm resulting from the accident was soft-tissue injury which was not disabling; and (13) that Spurrell's herniated or bulging disc was not shown, by sufficient evidence, to be related to the accident.
As for damages, the court noted that Spurrell suffered soft-tissue injuries which did not result in disabling pain or functional disability; it awarded general damages of $30,000. The court also found insufficient evidence to support a claim for lost wages, but awarded $10,000 for "some loss of earnings capacity or economic opportunity." The court denied Mrs. Spurrell's claim for loss of consortium. The court granted Great American's subrogation claim for benefits and medicals already paid to Spurrell, and assessed costs.
Judgment was therefore rendered in favor of Spurrell and against Steel Erectors and Lexington for $40,000, and in favor of Great American and against Steel Erectors and Lexington for $19,709.07.
Lexington appeals suspensively, urging that its insured, Steel Erectors, did not comply with the terms of its "claims made" policy and thus did not have coverage. Spurrell appeals devolutively, urging the court's award of general damages was inadequate; and the court erred in denying further workers comp benefits and in failing to order an MRI [sic] to determine the best mode of treating his bulging disc.
Great American has filed a brief primarily urging that Spurrell's damages are not inadequate, and also submitting that there was coverage on Lexington's policy. Steel Erectors has filed a brief arguing exclusively that there was coverage. Lexington has filed one response brief on the issue of quantum and one on the issue of coverage.

Applicable law
An insurance policy is a contract and has the effect of law between the parties. La.C.C. art. 1983; Pareti v. Sentry Indem. Co., 536 So.2d 417 (La.1988). Insurers have the same rights as do individuals to limit their liability and to enforce conditions upon their obligations; in the absence of conflict with statutes or with public policy, unambiguous provisions limiting liability must be given effect. Oceanomics Inc. v. Petroleum Dist. Co., 292 So.2d 190 (La.1974). "Claims made" policies are not against public policy or morals. Livingston Parish Sch. Bd. v. Fireman's Fund Amer. Ins. Co., 282 So.2d 478 (La.1973); Poirier v. National Union Fire Ins. Co., 517 So.2d 225 (La.App. 1st Cir.1987).
Apparent authority exists when the principal does some act to manifest the alleged agent's authority to an innocent third *1384 party and the third party then relies reasonably on the agent's manifested authority. Boulos v. Morrison, 503 So.2d 1 (La.1987). If one purporting to act as an agent receives an application, accepts the premium, secures and delivers the policy, and does everything necessary to attachment of the risk, the insured may assume that he is the properly authorized agent of the insurer. Tiner v. Aetna Life Ins. Co., 291 So.2d 774 (La.1974). Whether an insurance broker in any particular transaction acts as agent of the insured or of the insurer is a question of fact dependent on the particular circumstances of the case. Id.; Raymond v. Zeringue, 422 So.2d 534 (La.App. 5th Cir.1982). The principal is bound to execute the engagements contracted by his agent. La.C.C. art. 3021. The agent may bind the principal by waivers, representations or other acts within the scope of its business, unless the insured had notice of a limitation of the agent's power. Tate v. Charles Aguillard Ins. & Real Est., 508 So.2d 1371 (La.1987); Swain v. Life Ins. Co. of La., 537 So.2d 1297 (La.App. 2d Cir.), writ denied 541 So.2d 895 (1989).
Evidence of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the organization on a particular occasion was in conformity with the routine practice. The evidence may consist of testimony in the form of an opinion or evidence of specific instances of conduct sufficient in number to warrant a finding that the practice was routine. La.C.E. art. 406; Corbello v. Southern Pacific Transp. Co., 586 So.2d 1383 (La.App. 3d Cir.), writ denied 589 So.2d 1052 (1991).
The trial court's findings of fact are entitled to great discretion. Rosell v. Esco, 549 So.2d 840 (La.1989). In fact, where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or plainly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The trial court's discretion is premised largely on its ability to see and hear the witnesses and to make credibility determinations. Canter v. Koehring Co., 283 So.2d 716 (La.1973). However, the manifest error rule applies both to testimonial and documentary evidence. Virgil v. American Guarantee & Liab. Ins. Co., 507 So.2d 825 (La.1987).
When damages are not susceptible of precise measurement, much discretion is left to the trial court to assess those damages. La.C.C. art. 1999. An appellate court should rarely disturb an award for general damages. Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). Only if an award is first found to be inadequate or excessive on the facts of the particular case may the appellate court refer to the awards in "similar" cases. Reck v. Stevens, 373 So.2d 498 (La.1979).
An employee who sustains temporary total disability as a result of an accident on the job is entitled to weekly benefits "during the period of such disability." La. R.S. 23:1221(1)(a). The finding of disability under the workers comp statute is a legal rather than purely medical determination; ultimately it is a question of fact for the trial court and regulated by the manifest error rule. Manson v. City of Shreveport, 577 So.2d 1167 (La.App.2d Cir.), writ denied 580 So.2d 928 (1991). The burden of proof in a comp case is a preponderance of the evidence. Bruno v. Harbert Int'l Inc., 593 So.2d 357 (La.1992).
The employer is also obligated to furnish "all necessary medical, surgical, and hospital services" for employees sustaining compensable injury. La.R.S. 23:1203 A. The employee must prove by a preponderance of evidence that his claim for medical expenses is related to the compensable injury. Sewell v. Argonaut Southwest Ins. Co., 362 So.2d 758 (La.1978); Lynn v. Berg Mechanical Inc., 582 So.2d 902 (La.App.2d Cir. 1991).
An employer or insurer is liable for terminating benefits when its action is found to be "arbitrary, capricious, or without probable cause"; upon such action the employer or insurer is liable for "all reasonable attorney's fees for the prosecution and collection of such claim [.]" La.R.S. 23:1201.2. The insurer, however, is entitled to take reasonable action based on the facts available to *1385 it at the time of the action. Brown v. Manville Forest Prod. Corp., 565 So.2d 496 (La. App.2d Cir.), writ denied 567 So.2d 1127 (1990). The employer or insurer is also liable for penalties for failure to pay unless, among other things, the employee's right to benefits has been "reasonably controverted" by the employer or insurer. La.R.S. 23:1201 E. To avoid liability under this provision the insurer must "reasonably counter" the claimant's factual and medical evidence. Green v. Jackson Rapid Delivery Serv., 506 So.2d 1345 (La.App.2d Cir.1987). The trial court's rulings as to both penalty provisions are governed by the manifest error rule. Brown v. Manville Forest Prod., 565 So.2d at 501.

Discussion: Coverage
In support of its argument that Steel Erectors is not entitled to coverage in this case, Lexington has offered a long discussion of the nature of a "claims made" policy and how it is different from the more common "occurrence" policy. Br., 7-15. Lexington argues that this occurrence could have been covered if Lexington or Steel Erectors had received a written notice of claim within the policy period or the automatic 60-day extended reporting period; if Steel Erectors had pursued other options (purchasing a "tail" or renewing the policy) to extend reporting; or, critically, if Steel Erectors had filed a written notice of occurrence within the policy period, thus activating the 36-month period, in which Spurrell's letter of September 15 would be timely. The notice of occurrence provision, ¶ IG, is as follows:
If the company receives written notification from the "insured" during the policy period of an "occurrence" which is likely to involve this policy, and if that "occurrence" results in a "claim" that is reported to the company within 36 months from the date the company was notified of the "occurrence", then this policy will respond as if the "claim" had been made on the last day of the policy period.
Notice of an "occurrence" is not notice of a "claim".
Notice of a potential "claim" must include:
1. How, when, and where the "occurrence" took place, and
2. The names and addresses of any injured persons and any witnesses.
Lexington correctly argues that Griffith did not personally send written notice of the occurrence within the policy period. On the record presented, however, this does not end the discussion.
First, the court found that Mr. Griffith provided notice to Smith Howard & McCoy in early May 1987. The evidence on this point was contested. Mr. Griffith testified that he called Ms. McDowell shortly after the accident and reported it. Ms. McDowell initially stated that he did not, but later admitted that she simply had no recollection that he had called. Dep., 17-18. She also had no independent recollection of handling the claim prior to September 1987. Id., 62-63. Ms. LaSalle did not know, from personal knowledge, whether Griffith called or not. Smith Howard & McCoy had no documentary evidence of receiving this call; the "claims schedule" attached to Ms. LaSalle's deposition suggests that the agency neither received the call nor processed a notice of occurrence at the time. However, other records which may have verified or refuted Mr. Griffith's testimony had been purged in 1989; only the claims schedule, which happened not to show a call, was retained by Ms. McDowell. Curiously, her decision to refuse coverage in September also does not appear on the claims schedule.
The trial court, hearing and reading this evidence, concluded that Mr. Griffith was the most credible witness and accepted his account of the events of May 1987. The trial court has vast discretion in matters of credibility. Canter v. Koehring Co., supra; Virgil v. American Guarantee & Liab. Ins. Co., supra. Given the conflicting testimony we cannot say the court was wrong to adopt Mr. Griffith's account over Ms. McDowell's.
We note at the outset that the record is devoid of evidence that Lexington did not receive written notice of occurrence during the policy period. This is significant because the plaintiff and Steel Erectors showed, through the testimony of Smith Howard & McCoy's employees Ms. LaSalle and Ms. McDowell, that the agency always forwarded *1386 written notice to the insurer when they received any notice from an insured. La.C.E. art. 406; Corbello v. Southern Pacific Transp. Co., supra. Ms. LaSalle explained they did so because notice was so crucial in a claims made policy. R.p. 738. Ms. McDowell was positive that when an insured called to report an occurrence, she would send written notification to the insurer. Dep., 40. The contrary evidence was like that cited previously; Ms. McDowell at first said she sent no notice, but then admitted that she just could not recall. Id., 61-62. By proving that Mr. Griffith phoned Smith Howard & McCoy in May 1987 and then proving the routine practice of automatically relaying such a call to the insurer in writing, Spurrell and Steel Erectors made a prima facie case that on the evidence presented, timely notice was indeed forwarded to Lexington. The burden thus shifted to Lexington to refute this, but there is no competent evidence to that effect.
Lexington offered no witness, deposition or other documentary evidence to refute the prima facie showing. In support of a motion for summary judgment, Lexington did offer the affidavit of a claims examiner, Mr. Powell, but the summary judgment was denied on January 31, 1991, and Lexington did not attempt to use Mr. Powell at trial or take his deposition. Lexington also did not attempt to show that Smith Howard & McCoy's claims schedule was a regularly conducted business activity, such that the absence of an entry therein would prove that the event never occurred. La.C.E. art. 803(6), (7). On this procedural ground the trial court was entitled to find that Mr. Griffith's notice to Smith Howard & McCoy was sufficient under the latter's business practices.
The court's precise finding was that despite the language of ¶ IG, the May 1987 notice to Smith Howard & McCoy was binding on Lexington. Lexington vigorously contests this finding, urging that it is contrary to the language of the policy. This is, strictly speaking, true; however, the evidence strongly shows that the notice requirement was not always strictly enforced. While ¶ IG demands "written notification from the `insured'," both Ms. LaSalle and Ms. McDowell testified that notification from an agency would be honored. R.pp. 736-738; McDowell Dep., 39-40. Mr. Adorno, an underwriter for Louisiana Risk Specialists (who had brokered Lexington's policy to Smith Howard & McCoy) also testified that if a producer phoned the insurer on the last day of the extended reporting period but written notice did not arrive until after the period had expired, there would be coverage "by any reputable insurance company." Dep., 61-62. Moreover, the record easily shows that regardless of policy requirements, Smith Howard & McCoy regularly accepted oral notices from insureds and processed them in a manner sufficient to bind the insurers. Given these facts, the trial court was entitled to examine whether Smith Howard & McCoy had the apparent authority to bind Lexington, despite the language of ¶ IG.
The first requirement for a finding of apparent authority is that the principal, Lexington, must act to manifest the authority of the alleged agent, Smith Howard & McCoy, to an innocent third party. Boulos v. Morrison, supra. The evidence of Lexington's acts in this case is somewhat close. It never communicated or transacted directly with Steel Erectors. However, it permitted Smith, Howard & McCoy to receive Steel Erectors' premium, to secure and deliver the policy to Steel Erectors, and to do everything necessary to attach the risk. These are attributes that support a finding of apparent authority. Tiner v. Aetna Life Ins. Co., 291 So.2d at 777. Mr. Adorno testified that normally the insured reports an accident to his agency, which in turn forwards notice to Louisiana Specialists or to the insurer. Dep., 55, 26. Ms. McDowell and Ms. LaSalle both testified that their agency routinely accepted claims from insureds and forwarded them to the insurers. R.pp. 738-738; McDowell Dep., 39-40. Notably, the policy does not prohibit this normal practice, and there is certainly no record evidence to suggest that Lexington disapproved of it until this claim arose. Finally, Lexington allowed Smith Howard & McCoy to reject Steel Erectors' claim in September 1987 without requiring that the claim be forwarded to Lexington's office. This is certainly more than a principal would permit a non-agent to do.
*1387 The second requirement for apparent authority is that the third person, Steel Erectors, reasonably relied on the manifested authority of the agent. On this point the evidence is strong. Mr. Griffith testified that he had previously reported a claim orally to Smith Howard & McCoy, and that they did the necessary paperwork for him. R.pp. 321, 614. Ms. LaSalle and Ms. McDowell established that this was Smith Howard & McCoy's usual procedure, and undoubtedly conveyed this to Mr. Griffith in delivering the policy. This procedure satisfied the requirement of ¶ IG that the insured send written notice to Lexington; under these facts, oral notice to the agent was sufficient, and would be followed by written notice to the insurer. Mr. Griffith definitely relied on Smith Howard & McCoy's authority when he phoned in the notice of occurrence and took no further action until he received Spurrell's letter.
The trial court, in its great discretion, found that Steel Erectors proved both requisites for apparent authority. We perceive no manifest error and will defer to this finding. Rosell v. Esco, supra. While we might not have drawn the same conclusion on analysis de novo, we are bound by the principle that the factfinder's decision can virtually never be wrong. Hae Woo Youn v. Maritime Overseas Corp., supra. When Smith Howard & McCoy accepted Steel Erectors' oral notice of an occurrence and represented that such notice was sufficient, this acceptance bound Lexington, which cannot now complain of lack of notice. Swain v. Life Ins. Co. of La., supra.
We are aware, and Lexington has ably argued, that Smith Howard & McCoy was not a licensed agent for, or ever dealt directly with, Lexington. An insurance agent is often considered the client's agent, not the insured's. See Trahan v. Bailey's Equip. Rentals Inc., 383 So.2d 1072 (La.App. 3d Cir.), writs denied, 390 So.2d 1342, 391 So.2d 455 (1980). Mr. Adorno, in particular, adamantly maintained the strict contractual relationships between the parties. However, licensure or the parties' perceptions are not dispositive factors in determining the true legal relationships in a given transaction. Tiner v. Aetna Life Ins. Co., supra; Raymond v. Zeringue, supra. On the record presented, these facts do not create manifest error.
Since the May 1987 notice to Smith Howard & McCoy was binding on Lexington as a notice of occurrence, Steel Erectors had 36 months from that date to file a formal notice of claim. This was done timely in September 1987. The trial court's findings to this effect are not plainly wrong and are affirmed.

Compensation
By his devolutive appeal Spurrell urges the trial court erred in awarding inadequate general damages and loss of earning capacity for his personal injury, in finding that he was entitled to no more workers comp benefits than those already received, and in refusing to order further testing to verify or refute a disc problem at L4-5. We address the comp claim first.
By his second assignment Spurrell argues that the trial court applied the wrong burden of proof in denying further benefits. He urges the court placed too much emphasis on the report of Dr. Osborne, who relied on a psychological profile run by Dr. Staats, and "this does not appear to be appropriate medical criteria upon which to terminate the worker's compensation benefits." Br., 18. Admittedly, psychological test results might not seem appropriate when the alleged disability results from a physical injury. However, Dr. Staats's work-up included seven "ergonomic strength tests," which required Spurrell to simulate postures and workloads representing those frequently occurring on his job. The tests involved placing loads on the muscles of the upper and lower limbs and the lower back. The testing is designed to detect "volitional elements" which might "discredit the maximum effort made," and to delete these elements. On three of the tests Spurrell performed better than 75% of the normal working population of his height and weight; on the other four, he performed "well." R.p. 73. The psychological tests showed that he was "enhancing his symptoms for manipulative purposes and for controlling secondary gains." R.p. 76.
*1388 Dr. Osborne's report referred to Spurrell's negative X-rays, CT scan and bone scan, and completely negative physical exams. Dr. Osborne found Spurrell had an I.Q. of 112 and diagnosed fibromyalgia. He concluded "from the physical testing and the intellectual scores there's no reason this patient shouldn't be functioning either at a normal job situation or being retrained." R.p. 68.
From these reports it is clear that Great American did not reject Spurrell's claim of physical disability merely on the basis of psychological tests.
Subsequent medical reports were not uniform, but they mostly supported Dr. Osborne's evaluation. Dr. Brian, who should be considered Spurrell's primary treating physician, ultimately discharged him with maximum cure in January 1988, but had noted no change in his condition since August 20, 1987. Dr. Long, who also treated Spurrell early in his recovery, expressed concern about his "thinking processes" in June 1987. Dr. Allen, who saw Spurrell four times immediately after the accident in May 1987, did not see him again until June 1988, at which time he found no objective symptoms.
Dr. Burda, who first saw Spurrell six months after the accident, advised him not to return to manual work in December 1987, but admitted he never gave general work restrictions or assessed a disability rating. Dr. Hayes, who first saw Spurrell eight months after the accident, primarily diagnosed post traumatic stress disorder, but also recorded complaints of "severe pain" as late as September 1988.
Spurrell testified that he has not worked since the accident, and cannot work because on bad days he can hardly move around. He admitted, however, that in the last year he had done enough hunting to kill three deer with a gun and one with a bow. His bow has 50-lb. tension.
In sum, the court was presented with some evidence to suggest that Spurrell could not work, but with frankly convincing evidence that he could. The court's finding, based on the totality of that evidence, is not plainly wrong and will not be disturbed. Manson v. City of Shreveport, supra. Further, it is clear that Great American's decision to terminate benefits in November 1987 was supported by adequate evidence at the time, and corroborated by subsequent medical reports. The court was not plainly wrong to deny penalties and attorney fees. La.R.S. 23:1201 E, 1201.2.
As a final comp matter, Spurrell urges the trial court was wrong to deny his claim for an MRI to resolve conflicting diagnoses of his back. Surely Spurrell means a "myelogram," as an MRI was already conducted in July 1988; Dr. Long recommended a myelogram to "clear the water" and Dr. Osborne felt a myelogram could resolve the inconsistent results. A claimant must prove, however, that the medical expenses are related to the compensable injury. Sewell v. Argonaut Southwest Ins. Co., supra. Both the lay and expert testimony shows that the beam hit Spurrell in the upper back at L1-2. During his initial treatment, Spurrell never complained of lower back pain. The MRI, taken over a year after the accident, showed decreased disc space and mild herniation in the lower back, at L4-5. This is the condition for which Dr. Long would like to run a myelogram. The medical and lay evidence does not, by a preponderance, relate Spurrell's condition at L4-5 to his injury at L1-2. Rather, Drs. Osborne and Brian attributed the L4-5 bulge to normal degenerative processes. The trial court was not wrong to deny this medical claim.

Quantum
By his first assignment Spurrell urges the trial court erred in awarding only $30,000 for his pain and suffering and only $10,000 for his lost earning capacity. In support he cites several cases which he claims are similar and resulted in higher awards. Before referring to prior awards, the court must determine that the instant award is inadequate for the plaintiff's injuries. Reck v. Stevens, supra.
The thrust of Spurrell's argument is, once again, that the court placed too much emphasis on Dr. Osborne's report; in fact, it deprecates Dr. Osborne's testimony since he was not tendered in any medical specialty. Br., 13. Even though Dr. Osborne testified only as a general practitioner, he has worked *1389 extensively with chronic pain problems and rehabilitation, and was a founding member of the American and Southern Pain Societies. R.p. 417. Spurrell also complains that "Dr. Osborne did not physically examine Mr. Spurrell." Br., 13; R.p. 439. However, Dr. Osborne saw him on three occasions and ordered physical tests "done under my direct supervision by a technician." R.p. 440. The court ultimately allowed Dr. Osborne to testify as to the results of those tests. R.p. 444.
In further support of his argument, Spurrell relates in much detail the testimony of Drs. Burda and Hayes, who accepted his complaints and felt he was unable to return to work, and portions of Dr. Allen's and Dr. Long's testimony which corroborate Dr. Burda's findings. He does not mention that Drs. Osborne and Brian both recommended that he return to work, or that Dr. Long expressed concern about Spurrell's "thinking processes" and "conversion reaction." As with the disability question, there was some medical evidence to support Spurrell's claim of continued, severe pain, and more to refute it.
Perhaps the most important aspect of the question, however, was the trial court's credibility call, which was discreetly resolved by declaring Spurrell "an unreliable historian with regard to his own medical problems and the injuries sustained in the accident." R.p. 787. In an early deposition, Spurrell denied any prior problems or that he had ever been X-rayed prior to this accident. However, Dr. Allen testified that Spurrell had seen him on several occasions for chiropractic treatment between 1984 and 1987. R.p. 567. Hospital records from Schumpert also showed that he had been hospitalized in 1981 for headaches and undergone CT scan, X-rays and neurological exams, all of which were normal. Ex. P-11. Spurrell also stated in that deposition both that he rarely drank and that he drank too much. R.pp. 691-693. He admitted he was undesirably discharged from the army for going AWOL and had an arrest in Texas on drug charges. The latter point was not technically admissible, La.C.E. art. 609 F, but was not objected to. R.p. 661.
Spurrell testified that he has back pain 90% of the time, and that it hurts him to climb stairs, overexert himself, twist, turn, or sit for an hour and a half. R.pp. 687, 690-691. For this reason he has not applied for a single job since the accident. R.p. 690. Despite his alleged pain, Spurrell has been hunting some 15 times a year, both morning and evening, including one hunting trip just days before trial. He rabbit hunts with dogs, and bow hunts using a bow with a 50-lb. pull. He climbs in and out of a 14' deer stand and sits there for an hour and a half. R.p. 389. He has killed several deer and wild hogs since 1990.
Viewing all this evidence, the trial court was certainly able to find that Spurrell's injuries were not as painful or debilitating as he has claimed. On this record a credibility call unfavorable to Spurrell is not plainly wrong. Rosell v. Esco, supra; Canter v. Koehring Co., supra. The award of $30,000 for pain and suffering is not an abuse of the court's discretion. La.C.C. art. 1999; Hae Woo Youn v. Maritime Overseas Corp., supra.
Spurrell next contests the award of only $10,000 for lost earning capacity. In support he claims the trial court "recognized that the bulging disc which [he] received in the accident impaired his earning capacity." Br., 8. The court, however, did not so find. It stated:
These are essentially soft tissue injuries which are not disabling. There is insufficient evidence to conclude that any medical findings regarding a herniated or bulging discs are related to the accident on May 1, 1987.
R.pp. 788.
In short, the court did not find that Spurrell's bulging or herniated disc caused him any lost earning capacity. Rather, the court found that Spurrell's underlying personality disorder manifested symptoms after the accident. In fact, Dr. Hayes diagnosed Spurrell in January 1988 with post traumatic stress disorder, which was by then resolving; he testified that by May 1989 the condition had "fairly well abated." Dep., 14, 29. As we appreciate it, the court implicitly recognized that Spurrell's personality disorder caused him to exaggerate his injuries. Bearing in mind the equivocal nature of the medical evidence and Spurrell's credibility problems, *1390 we do not consider the award of $10,000 to be an abuse of discretion. It will be affirmed.
Finally, Spurrell argues in brief (without specifically designating it as error) that the court erred in denying his ex-wife's claim for loss of consortium. The court rejected this claim discreetly, finding "insufficient and inadequate testimony and facts" to support it. R.p. 789. Mrs. Spurrell, however, denied she wanted anything as a result of her former husband's injury. R.p. 602. As for Mark Spurrell's own claim for loss of love and affection, Mrs. Spurrell testified that she left him because of a pattern of physical and mental abuse, chiefly Spurrell's questionable conduct with her 14-year old daughter of a prior marriage. Mrs. Spurrell filed charges against her husband for this. R.p. 598-599. The trial court did not err in rejecting this claim for damage.

Conclusion
For the reasons expressed, the judgment is affirmed. Costs are assessed equally to Lexington Insurance Company and to the plaintiff, Mark Thomas Spurrell.
AFFIRMED.
LINDSAY, J., concurs in the result, but does not subscribe to the majority's findings and discussion regarding "apparent authority."

APPLICATION FOR REHEARING
Before MARVIN, NORRIS, LINDSAY, STEWART and WILLIAMS, JJ.
Rehearing denied.