hMcMANUS, J.
In this matter, the very simple issue to be decided is whether an endorsement to a policy of insurance had been “sent” to the insured before the date on which a loss was incurred. For the reasons that follow, we affirm the judgment of the trial court, agreeing that the endorsement in question is not binding on the insured.
FACTS
This matter comes to us after a trial on the merits which decided only the issue of policy coverage. The procedural history of the matter and the more extensive background facts surrounding the claim at issue are well known to all parties. Therefore, we will only briefly summarize the facts pertinent to our decision here.
The automobile accident giving rise to this suit occurred on June 6, 1997. At the *468 time of the accident, the Browns were occupying a 1994 Toyota “4Runner.” There seems to be no question that Wilfred Brown, Appellant Permanent General Insurance Company’s insured, was totally at fault; Ethel Brown, Wilfred’s wife and also a named insured, was killed in the accident.
The application to renew an existing policy, with no changes to the policy, had been completed by Ethel in February of 1997. However, sometime later in the same month, she contacted ABC Agency Network, Inc., the agent through whom the policy had been issued, Uto request changes in the policy coverage.
Wilfred Brown testified that it had been the couple’s intent to remove a 1994 Lincoln from the policy, add a 1997 Lincoln to the policy, and lower the limits of liability coverage on the Lincoln to the legal minimum coverage of 10,000.00/20,000.00/10,-000.00. Wilfred testified that it had been the Browns’ intent to keep coverage on the other auto listed on the policy, the 1994 Toyota, at the original policy limits of 100,-000.00/300,000.00/50,000.00, as required by a lease on the vehicle.
Sean Buras, who had been the manager of ABC Agency’s Westbank office at the time the Browns renewed, then sought to alter, their policy, testified that the Browns had intended to lower limits on all listed autos to the 10/20 coverage. Buras testified that Ethel, with whom he had spoken, understood that any change in the liability limits would change the limits for all vehicles listed on the policy.
A request for changes in the Browns’ policy, dated March 11,1997, indicates that the Browns wished to “delete” a 94 Lincoln and “add” a 97 Lincoln, and to “change limits of liability on veh. 1 & 2 to 10/20/10.” A binder issued to Ethel on this same date does show limits of 10,-000.00/20,000.00/10,000.00, but lists only a 1997 Lincoln Town Car.
Because the policy premiums did not immediately reflect lower limits, however, Ethel contacted the ABC agency sometime in late March to request that the agency contact Permanent General to correct the mistake.
Wilfred identified three endorsements subsequently received by the Browns between March and early June of 1997. One endorsement, an “insured copy,” was “processed” on March 10, 1997, and was countersigned by ABC on March 18, 1997. This endorsement lists a 1994 Lincoln and a 1994 Toyota and shows limits of 100,-000.00/300,000.00/50,000.00. A second endorsement, also an “insured copy,” lists a 1997 Lincoln and a 1994 Toyota and shows limits of 100,000.00/300,000.00/50,000.00; this endorsement had been “processed” on March 24, 1997, and countersigned by ABC on May 28, 1997. A third “insured copy” listed the two vehicles, limits of 100,-000.00/300,000.00/50,000.00 and had been issued to add Toyota Motor Credit as the lienholder of the 4Runner.
Wilfred denied that the Browns had received anything further from ABC, specifically denying that they had ever received anything showing lower limits than the 13IOO,000.00/300,000.00. However, the record does contain an “agent copy” of an endorsement listing both cars and showing the 10/20 limits. This endorsement was “processed” on April 23, 1997, but does not indicate the date on which it had been countersigned by ABC.
Buras testified that the “processing” date on the policies reflects various activities on the part of the insurer, who thereafter forwarded the papers to the agent for mailing to the insured. He further testified that endorsements were typically countersigned by ABC, then sent to their clients, within one or two days of their *469 receipt by ABC, and that the endorsements would have been forwarded to an insured within ten days of the date on which they had been processed by the insurer. Buras had no explanation for the lapse of several months between processing and countersigning indicated on the last two endorsements received by the Browns. In addition, Buras testified that an insured who received any of the endorsements would have had a reasonable belief that the limits of his policy were the higher limits of 100,000.00/300,000.00.
There does not seem to be any question that after Ethel’s complaints to ABC about the premiums, the Browns did make several payments on the policy at a figure substantially reduced from the premiums set under the original 1997 renewal.
The trial judge, in ruling that the endorsement showing the lower limits had not been in effect on the date of loss, made the following findings:
There’s papers that say at least two different things in this case: One says the 300,000 policy and one says the 10/20. But I noticed that on May 28th two copies were mailed out, both saying that these people had $300,000 limits. They — this lady probably got this the same week that the accident occurred and she was killed.
[[Image here]]
I think that if there is a mistake — or the only document that purports to show that it was reduced doesn’t even mention the Toyota 4-Runner. And the one document that does have the 10/20... that’s typed out that says 10/20 that went out to her, you know... we really don’t know when it was mailed or whatever. But we do know that the week before she got one that said she had $300,000 policies.
ASSIGNMENTS OF ERROR NUMBERS 1 AND 2
Permanent General’s assignments of error challenge the trial judge’s ruling that the endorsement which lowered the limits on the Browns’ Toyota was not binding on the |4Browns. We agree that the record does not support any other finding.
We note initially that this matter does not present a question .of contract interpretation. Rather, the case presents a dispute surrounding a simple issue of fact: whether the 10/20 endorsement was ever sent to the Browns.
LSA-R.S. 22:628 requires that changes, or, endorsements, to an existing policy be sent to an insured:
No agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be valid unless it is in writing and physically made a part of the policy or other written evidence of insurance, or it is incorporated in the policy or other written evidence of insurance by specific reference to another policy or written evidence of insurance.
[[Image here]]
Any written agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be deemed to be physically made a part of a policy or other written evidence of insurance, within the meaning of this section, whenever such written agreement makes reference to such policy or evidence of insurance and is sent to the holder of such policy or evidence of insurance by United States mail, postage prepaid, at such holder’s last known address as shown on such policy or evidence of insurance or is personally delivered to such holder.
As noted, the binder issued to Ethel and which shows limits of 10/20 lists only the *470 1997 Lincoln. And Wilfred Brown denies that the Browns ever received any other endorsement lowering the limits on the Toyota to the 10/20 minimum.
The evidence offered to show that the endorsement had been sent to the Browns consisted of evidence which purported to show ABC’s business practice of forwarding such papers to client insureds.
Under LSA-C.E. art. 406, such evidence is relevant:
Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice. The evidence may consist of testimony in the form of an opinion or evidence of specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine.
1 sSuch evidence, however, is not conclusive to prove the fact sought to be established. Evidence of a routine practice establishes only a prima facie case, which may be rebutted. Spurrell v. Ivey, 25,359, at 13 (La.App. 2 Cir. 1/25/94), 630 So.2d 1378, 1386. Further, the trial judge’s findings on whether the evidence sufficiently proves compliance with a routine practice in any particular instance cannot be disturbed absent manifest error. See Corbello v. Southern Pacific Transp. Co., 586 So.2d 1383, 1387-88.
We find the evidence offered to describe ABC’s routine business practices inconclusive to show that the 10/20 endorsement had actually been sent to the Browns. We note initially that the endorsements actually received by the Browns — “insured” copies — bear a date indicating when the endorsements were countersigned by ABC; the 10/20 endorsement — an “agent” copy— does not show such a date. In his testimony, Sean Buras distinctly associated this countersigning with the forwarding of endorsements to ABC’s clients. We further note, and give great weight to, evidence which belies assertions that endorsements were routinely immediately forwarded. While Buras testified that endorsements would have been sent to an insured within 10 days of being processed by an insurer, he could not deny the fact that two of the endorsements received by the Browns had been countersigned almost two months after they were processed by Permanent General. The trial judge’s finding, that “we really don’t know when” the 10/20 endorsement was mailed to the Browns, is not clearly erroneous.
We do not know that it was mailed. As noted, Wilfred Brown denies having ever received the 10/20 endorsement. ABC’s evidence of their customary practice, therefore, has been further undermined— rebutted — by the Browns’ evidence.
Finally, we note that Permanent General’s arguments — that the Browns are bound to the lower limits because they paid a lower premium — are unavailing. LSA-R.S. 22:628 does not address the possible effect of such payments when there is a question of whether the endorsement generating the lower premiums has been “sent.” However, this one factor should not effectuate lower limits in this case. There is no question that the Browns wished to maintain the lower limits on the Lincoln, and it would not have been unreasonable for them to assume that the lower premiums reflected only this change. And even Permanent General’s witness testified that the Browns would have been reasonable to assume that the Toyota had been covered with the 100,000.00/300,000.00 limits at the time of the accident in | ^question.
*471 The language of LSA-R.S. 22:628 is clear and unambiguous. It is mandatory that endorsements effecting a change in coverage be “sent” to the policy holder. Permanent General has not shown that these directives were satisfied: the trial judge was correct to not allow enforcement of the contested endorsement to the Browns’ policy.
Therefore, for the above reasons, the judgment is affirmed.
AFFIRMED.