Judgment rendered October 22, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,440-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

ANDREW MCBRIDE AND        Plaintiffs-Appellants
GINGER MCBRIDE

versus

RAFAEL LARA        Defendant-Appellee
CONSTRUCTION, LLC

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 20192395

Honorable Jefferson Bryan Joyce, Judge

* * * * *

TYLER GRAHAM STORMS        Counsel for Appellants


DAVENPORT, FILES & KELLY, LLP        Counsel for Appellee
By: Martin Shane Craighead


* * * * *

Before STONE, ROBINSON, and HUNTER, JJ.

**ROBINSON, J.**

Plaintiffs, Andrew and Ginger McBride (collectively, "Plaintiffs" or "the McBrides"), filed suit in Ouachita Parish against Defendant, Rafael Lara Construction, LLC ("Defendant" or "Lara"), for breach of a construction contract entered into between the parties for various alleged deficiencies in the construction of their home. Lara filed a reconventional demand for the balance owed on the contract as of the date he was terminated. Trial was held on February 26, 2024. The trial court issued a judgment and written reasons for judgment on May 8, 2024, awarding the McBrides a total of $35,400, offset by an award to Lara of $13,540 for its reconventional demand, for a net award to the McBrides of $21,860. Both parties filed motions for new trial. After a hearing on the motions, the trial court issued its second judgment and written reasons for judgment on October 24, 2024, reducing its total award to the McBrides by $13,500 and Lara's award by $3,800, for a net award to the McBrides of $12,160. The McBrides filed a devolutive appeal.

For the following reasons, we AFFIRM the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

The McBrides and Lara entered into a contract for the construction of the McBrides' home on August 22, 2018. Plans and specifications had been prepared by an architect, Allan Pogue ("Pogue"), in the summer of 2018 and were incorporated into the contract. Construction of the home commenced with the pouring of the foundation in early October 2018.

The McBrides complained of several deficiencies in the construction of their home and ultimately terminated Lara. The McBrides paid third

parties to complete the home after Lara's termination. They claim they spent approximately $45,000 over the maximum contract amount and provided receipts therefor, although Lara claims that the McBrides overstated the amount by approximately $25,000. Although there were copies of estimates for certain repair work in the record, there were no itemized receipts showing what was actually spent by the McBrides following Lara's termination.

*Alleged Construction Defects*

The McBrides first complained of construction defects when there was exposed rebar in the foundation as well as wood forms that remained embedded. Shortly after, during the framing process, the wall between the garage and kitchen misaligned with the anchor bolts in the foundation. The McBrides claim they did not terminate Lara at that time because they were assured the wall could be pushed in, and they did not realize that the embedded forms resulted in a likelihood of termite intrusion, rot, and honeycombing of the slab. However, Chad Parker ("Parker"), of Inspections Unlimited, testified that the open wall with exposed anchor bolts passed inspection.

Rafael Lara ("Mr. Lara") testified that conflicts with the McBrides began when Lara used the Weyerhaeuser Gold brand of floor decking rather than the Advantech brand orally requested by the McBrides. Mr. Lara explained that he had intended to use Advantech, but that it was not in stock at that time. Mr. Lara agreed to double the decking used with no charge in order to satisfy the McBrides, and the McBrides stated that they accepted the

2

remedy because the contract specifications did not require the Advantech product.

The roof was installed on the house in December 2018. Mr. Lara testified that he chose to roof the house earlier than usual due to the excessive amount of rain there had been during the project. He stated that he was aware that there would be some damage to shingles from installing the brick and siding after the shingles were in place, but he wanted the house to be sealed as much as possible so that issues with water intrusion would be minimized. Lara used 7/16" OSB (oriented strand board) roof decking, while the specifications listed 5/8" foil-backed decking with plywood clips. Lara also used 26-gauge galvanized aluminum flashing for the roof in locations where there would be brick and 26-gauge powder-coated aluminum trim coil for the exterior flashing. The specifications listed 26-gauge galvanized steel for the roof. The McBrides claim that they specifically requested the 5/8" decking listed in the specifications because it was a higher quality, stronger material, alleging later that the 7/16" decking was an inferior product that caused the roof to sag. Mr. Lara testified that he did not recall any specific direction from the McBrides regarding the decking. Lara claims that both sizes of decking were code-compliant and would work the same in this situation, because the product's thickness related more to snowpack, which was not applicable in this locale, especially with the steep pitch of the McBrides' roof. Pogue testified that the roof decking on the house was appropriate and consistent with the specifications.

The McBrides also claim that the aluminum flashing used by Lara was an inferior product and not as durable. Mr. Lara testified that he does

3

not like to use the galvanized sheet metal because it is not aesthetically pleasing, and he prefers to use aluminum trim coil, because it will not rust like the steel product, and it is powder coated to match the eaves and soffits of the house. He noted that the product used was also a 26-gauge metal.

Following installation of the roof, there were leaks in three different locations: between the garage and house below the laundry room; in front of the dormer into the office; and over the back side of the garage into the dining room area. Mr. Lara testified that at the time of the leaks, the flashing had not yet been installed. Insulation had been sprayed into the walls, but no sheetrock had been installed. He stated that, upon discovery of the roof leaks, Lara removed the insulation to ensure there were no leaks behind the wall. Once flashing was installed, Mr. Lara soaked all the flashing with a pressure nozzle hose to check for leaks, which he videoed and sent to the McBrides. At some point during this process, Mr. McBride claimed that the walls were still leaking. Mr. Lara testified that he inspected the walls by physically putting his hands between the walls and the delta straw (plastic sheeting at the bottom of the house), applying paper towels to the foam boards between the studs, and cutting holes in the upstairs sheetrock, none of which indicated any moisture. Dakota Breshears ("Breshears"), who was Lara's project manager during the time of the McBrides' project, testified that a moisture meter was used on the entire wall where there had been a leak, and the studs were checked top to bottom. Mr. Lara determined that the leaks in the garage/dining room area were due to some holes in the shingles made from attaching the toeboards to the roof during the vinyl installation. He stated that the holes were sealed, with the

4

intention to later replace the shingles, which stopped the leaks. Mr. Lara also determined that the leak in the office area was from the off-centered dormer. Lara adjusted the framing to center it up better.

Despite not finding any moisture following the repairs and testing, Lara scheduled a sheet metal company to install additional flashing in the roof valleys that may be prone to leaks. Because rain was predicted, Lara installed temporary hog troughs (large metal sheets bent to the area) in the roof valleys until the permanent custom flashing could be done in order to prevent any further leaks. However, the McBrides ordered Lara to stop work on the project immediately after Lara had installed the temporary hog troughs and prior to the custom permanent flashing installation.

The McBrides also expressed concern over 10 of the 12 windows being difficult to lock or open and close, especially regarding safety issues. Mr. McBride testified that he had a window sales representative, Brian Abernathy ("Abernathy"), inspect the windows. He told Mr. McBride that the windows had not been installed properly and that the cavity was too small. However, Dale Lusby ("Lusby"), a Russell Moore salesperson who coordinated with the window manufacturers, testified that he also went to the house to inspect the windows along with another Ply Gem sales representative, Scott Hall ("Hall"). Lusby testified that he and Hall concluded that only a few windows were "closing tight," but they could be improved by replacing the window sashes with a smaller size. Lusby stated that the cost to replace the sashes would be approximately $400 to $500, but they would have replaced them for free as a courtesy. Lusby further testified that he received an email from Abernathy, who Mr. McBride testified had

5

also inspected the windows, in which Abernathy relayed that the windows were actually installed pretty well. Abernathy stated that, although there were some exceptions in which the window seals were slightly crowned, resulting in preventing a sash from completely closing to lock, they were not off by much. He also stated that he did not recommend changing out all the windows.

The McBrides claim that front elevation was shoddy and defective, in that the planned louvers and gables were either off center or not existing, and otherwise not built to specifications. Lara reconstructed the gable and dormer to recenter it. Mr. Lara testified that it measured within 1/16" from center. However, Mr. McBride testified that, although the gable and dormer were improved, they were still "off" and did not look like what they should have per the plans. Mr. Lara further noted that the dormer was removed altogether after the job was shut down and he was terminated.

Mr. McBride testified that the stones on the front façade were severely gapped and only pressed in, there were sections with no mortar, and some stones had fallen off. He stated that, following Lara's termination, he had someone replace the fallen stones and repaired sections in the front entry area, but that it still looked terrible. Mr. Lara testified that the stones were installed according to the manufacturer's instructions, and he intended to replace any missing stones prior to completion of the project as a "punch list" item. Breshears testified that the stone façade was not complete because it was installed prior to the vinyl, metal soffits, and fascia material. He explained that the stone had to be left short in order to properly install the

6

metal on the bird boxes on the corners so that the vinyl could go all the way in, then they would go back and fill in those sections.

The McBrides also complained that Lara used regular sheetrock instead of moisture-resistant sheetrock in the garage. Mr. McBride testified that Mr. Lara asked to change the wood paneling listed in the specifications to drywall, and he agreed to the request, but only if it was moisture-resistant. Mr. Lara testified that he intended for the "green rock" moisture-resistant sheetrock to be used around the garage door only, and that regular drywall was appropriate for the rest of the garage, but that he offered to use the moisture-resistant product for the entire garage to satisfy the concerns of the McBrides. He further noted that the wood paneling listed in the specifications was not code-compliant. Parker also testified that the 3/8" wood paneling was not code-compliant and would not have passed inspection.

Mr. McBride testified that he had two third-party contractors provide estimates for certain repair work. Pike Bryant Construction provided an estimate to reconstruct the roof per plans and specifications and change out the garage drywall. Achievers of Louisiana, Inc. provided an estimate to change out the windows, remove and replace the stone veneer, add insulation, and redo drywall. However, neither contractor ever performed any work for the McBrides' home. Once Lara was terminated, Mr. McBride, though unlicensed, assumed responsibility as the "contractor," and the McBrides hired Giovani Penada ("Penada), who is also unlicensed, as a manager/consultant to complete the repairs they alleged were necessary. Notably, the McBrides complained that some of the alleged deficiencies in

7

the construction were attributable to Lara using some unlicensed subcontractors, to the extent the McBrides reported the issue to the Louisiana State Licensing Board for Contractors.

The McBrides claim that they spent approximately $44,000 over the contract price of $360,950.23 – approximately $405,000 total – to get the house in a "livable condition." However, there are no invoices or receipts in the record to support the amounts claimed to have been spent by the McBrides to finish the project. The McBrides claimed that it would be more efficient to testify as to what was done and give the maximum contract amount to support the amounts rather than introduce numerous receipts.

Megan Lara ("Mrs. Lara"), who handles all bookkeeping and general office management for Lara, testified regarding the expenses of the McBride project. She first pointed out that no profit was ever billed to the McBrides since Lara was unable to complete the project. Mrs. Lara discussed at length the information that Lara had received regarding the work performed on the McBrides' home by others following its termination (which was not included in the record). She testified that there were multiple expenses for work that were not included in the contract and plans, such as brick work on the steps, additional dirt work, and even miscellaneous items like candy bars and sodas. Mrs. Lara noted a particular invoice from Penada included an expense of almost $20,000 for a driveway, at least in part due to higher labor rates that were almost double those quoted by Lara, when Lara's driveway allowance was only $7,000. She also referred to expenses from change orders, such as certain light fixtures, an outdoor kitchen, and running an extra gas line. Mrs. Lara testified that it was unnecessary to spend $405,000

8

to finish the job, because at the time that Lara was terminated, there was still every amount left in the budget to finish the job in an acceptable manner, and it was not Lara's responsibility to incur the extra costs. She reiterated that Lara was not allowed to correct any defects that they would have corrected by the time the project had been completed, and she did not believe Lara should be responsible for the premature cancellation of their contract.

***Repair Negotiations***

On February 20, 2019, sometime during the process of Lara's repair of the roof flashing, McBride suspended work on the house. The McBrides sent a demand letter to Lara on February 26, 2019, complaining primarily of the roof leaks and improperly built roof gable and dormer over the front door and stating that they had lost confidence in Lara's ability to complete the job. The McBrides proposed three options: (1) Lara remedies all defects listed within the letter, which included 18 numbered items, at Lara's expense and at the direction of a consultant to be chosen by the McBrides, in single stages to be approved by the McBrides upon completion of each stage, with the home to be completely finished within 60 days; (2) Lara covers the complete cost of another contractor of the McBrides' choosing to repair and finish the home, at a referenced approximate cost of $200,000; or (3) Lara purchases the home in an "as is" state for $319,000, with any claims due against the property being Lara's sole responsibility.

Mr. Lara responded by letter to the McBrides on March 1, 2019, stating that he disagreed with almost all the allegations. Mr. Lara acknowledged some issues with water during the heavy rains in connection

9

with the steep roof valleys on the front of the house and recommended the process for correction of the issue. He noted that he was unable to undertake any of the recommended measures since the job had been shut down, but that he was willing and ready to finish the project. He also proposed using a mediator to work through any of their conflicts.

Following the initial correspondence between the parties regarding the alleged defects, the McBrides hired Michael Burroughs ("Burroughs") with QED Service, a licensed home inspector, to conduct a visual inspection of the property, which took place on April 29, 2019. The McBrides also retained counsel, Charles Heck, Jr. ("Heck"), to represent their interests regarding the dispute. Heck sent a follow-up demand letter to Lara on behalf of the McBrides on June 3, 2019, regarding the initial alleged defects, as well as those identified by Burroughs' inspection. A copy of the inspection report and third-party estimates for alleged necessary repairs were attached to the letter. The letter referred to the following defective conditions and repairs therefor:

1. Specified 5/8" decking was not used, requiring removal and replacement of the entire roof, since patching would result in mismatched shingles.

2. 26-gauge metal flashing specified was not used.

3. Insulation from the garage to the ceiling, garage to the house wall, roof line, and between floors, is either missing or improperly sealed.

4. Stone on the front of the home was incorrectly installed, some pieces are falling off, and corner pieces are missing.

5. Sheetrock is missing in certain areas and is either incorrectly installed in other areas or damaged from prior attempts to repair roof leaks.

6. Windows were improperly installed.

> 7. The window above the entry archway is off center, making the house appear crooked, necessitating replacement including stone repair.

> 8. Sheetrock in the garage must be replaced with moisture board.

Certain resolution options were again proposed. First, Lara may make all repairs specified in the demand letters and finish the project but must be under the supervision of a consultant. Second, the McBrides will transfer the home for the sum of $325,000 plus attorney fees incurred. Third, Lara may pay for the repairs to be performed by the third-party contractors who provided the repair estimates to the McBrides. The letter stated that the McBrides intended to file suit should Lara refuse to take action per their demand.

In response to the McBrides' demand, Lara retained Shane Craighead ("Craighead") as counsel. Craighead sent a response letter to Heck on June 13, 2019. Lara proposed to attempt a mediation conference to discuss all the issues raised by the McBrides, using a mediator with experience in construction. Craighead's letter addressed all the issues raised in Heck's June 3 letter, as follows:

> 1. The reference in the specifications to 5/8" decking was innocuous, as industry standard is either 1/2" or 7/16" decking. There were never any discussions between the parties to use 5/8" decking and Lara did not charge for that product. Further, there are no defects with the roof as currently constructed, and it would be senseless to replace an entire roof simply based on the difference of 1/8" thickness in the decking.

> 2. The 26-gauge metal flashing specified used was industry standard, code compliant, and as obtained by the local supplier.

> 3. The garage, including the ceiling, is insulated. Should the McBrides wish to have additional insulation on the interior wall between the garage and the house, Lara is willing to do that. The

11

insulation between floors is not blown in until after wires are pulled for final light fixtures, at the end of construction.

4.  The plans do not specify any stone material that would be deemed a "corner piece."  The two places on the front porch area where stones fell off are easily repairable and demolition of the entire façade is unnecessary.

5.  The missing sheetrock was removed in order to investigate the McBrides' leak claims and Lara intended to replace them.

6.  The window sales representative indicated a couple of windows have molding slightly intruding the window track, which is easily fixed.

7.  The window above the entry archway was initially slightly off center, but it was already taken down and corrected where it is now centered.

8.  The plans actually called for wood paneling/plywood with a paint finish for the garage interior, but was upgraded by Lara with sheetrock, which is code compliant.  Nonetheless, Lara is willing to replace it with plywood.

Craighead sent an additional letter to Heck on July 2, 2019, in order to further elaborate on the issues previously addressed in Craighead's June 13 letter.  It was reiterated that Lara stood ready to complete construction of the home; however, Lara would not be responsible for completion of any work or resulting expense should the McBrides choose other builders to complete the home.

The McBrides provided Lara with written notice of official termination due to its "failure … to comply with the terms of the agreement, numerous deficiencies, and very poor workmanship," noting that they would be pursuing damages for breach of contract.  The McBrides ultimately filed suit on July 31, 2019.  A one-day trial took place on February 26, 2024.

***Dave Jackson Meeting and Phone Conversation***

During the period in which the McBrides had suspended work, Mike Hipp ("Hipp"), the McBrides' loan officer, contacted Dave Jackson ("Jackson"), another licensed contractor, hoping Jackson would get involved as a mediator between the parties and facilitate completion of the project. Jackson ultimately met with Mr. McBride and Hipp at the site to inspect the construction project and discuss the McBrides' concerns.

Jackson passed away prior to trial. Over Lara's objection, Mr. McBride was allowed to testify as to his version of what Jackson said during the meeting. Mr. McBride testified that Jackson said he would tear off the front veneer, and that Lara was "one hundred percent liable and responsible for" using the wrong decking and "responsible for" the drywall in the garage.

Mr. Lara learned of the meeting shortly after and called Jackson to discuss, recording the telephone call conversation. Over the McBrides' objection, the recorded call between Jackson and Mr. Lara was introduced into evidence. Lara argues that the recorded conversation serves as impeachment evidence because it directly conflicts with Mr. McBride's testimony regarding Jackson's statements at the inspection.

During the phone call, Jackson first explained to Mr. Lara that he knew Hipp from when he had built Winnsboro State Bank, and he agreed to the meeting and inspection because of that business relationship. Jackson stated that, before Mr. McBride arrived at the site, he had already looked at the roof and told Hipp that there was nothing wrong with it and he did not see any dipping and sagging between the rafters. Jackson stated that once Mr. McBride arrived, they went through the house to discuss various

concerns of the McBrides. He said Mr. McBride pointed out issues with the cabinets, but that he explained that they were only roughed in at that stage because they still needed to be painted, and they only needed adjustments. Jackson then stated that Mr. McBride referred to issues with the flashing and roof leaks. He explained that there were different ways to install flashing. Mr. Lara told Jackson that it was double-flashed, and Jackson commented that the leak was an easy fix. Jackson stated that Mr. McBride never said anything to him about the windows during the meeting, though he noticed that they just needed to be caulked. Jackson said he told Mr. McBride that he needed to bushhog the property, telling Mr. Lara that it looked like it had been neglected. Jackson said that he told Hipp after Mr. McBride had left that it appeared the McBrides were complaining of punch list items while construction was ongoing. Jackson commented to Mr. Lara that he did not find a difference between 7/16" and 5/8" OSB roof decking. He further noted that Hipp told him that the McBrides were not willing to drop the suit, which would be a condition for him to mediate the project. Jackson also commented that Mr. McBride seemed to "have it out" for Mr. Lara for whatever reason.

Hipp also testified that he listened to the recorded conversation, and it was consistent with Jackson's statements that he had heard during their meeting. Hipp also stated that he observed Jackson cleaning out the channel of one of the windows and then operating it without problem.

**Burroughs' Inspection and Testimony**

Burroughs was hired by the McBrides to conduct a *visual* inspection of the property. Neither a technical (in depth) inspection nor a mold

14

inspection was conducted. Burroughs prepared a detailed inspection report in which he referenced multiple findings regarding the grounds and concrete, slab, framing, roof (shingles and flashing), siding and masonry, windows, HVAC system, plumbing, electrical, walls and ceilings, carpentry. For the majority of the findings in the report, a notation was included that read, "Discretion advised. The significance of the finding is uncertain. Further study by a qualified licensed contractor is advised."

The McBrides later retained Burroughs as an expert in home inspection and price estimation. Notably, he was not qualified as an expert in construction. Burroughs testified as to the McBrides' allegations and elaborated upon the findings in his inspection report. He acknowledged that the home was in an unfinished state, and his testimony regarding all issues was in light of that.

Burroughs first pointed out that there were cracks in the concrete driveway and parking areas. He also noted that he observed issues with the foundation, including wood and rebar that remained exposed, honeycombing in the concrete, and several anchor bolts that were not activated.

He also discussed several issues with the roof. He testified that the improper flashing allowed too much runoff, which caused leaks. He stated that he observed some cupping or sagging of the decking, there were nails exposed that were not properly sealed, and the shingles were lifting because they were either installed too tightly or improperly. He further stated that the flashing was bent and improperly cupped in and was missing kickouts. He testified that the lightweight metal is lower grade and does not hold up to

wind, but he could not tell whether the roof was "up to code" since he could not see underneath.

Burroughs testified regarding the use of 7/16" versus 5/8" roof decking. He explained that, in the past, 1/2" roof decking on 24" centers was standard, but building codes have changed to increase the thickness of the decking and to narrow the spacing in order to increase the PSF (pounds per square foot) ratings, because roofs were getting "bellies," sagging between the rafters. Although he stated that he observed some sagging in the roof, Burroughs did not specifically testify as to whether the use of the 7/16" decking was the reason for the sagging, only that the use of the product generally may have that result.

Burroughs pointed out that there were areas in the siding with no moisture barriers or extreme gapping, though the siding installation was not complete. He testified that there was loose siding, cracks in several locations, and gaps in the fascia, soffit boxes, and cornices. He explained that construction/installation of the soffits and fascia was complete.

Burroughs further testified that the windows were out of plumb and pinched, and they should have been functioning at that stage. Instead, there were gaps around the windows, headers missing weepholes, and the siding was improperly flashed and caulked.

Burroughs was questioned regarding the stone façade. He stated that the panels had large gaps where water could enter and get behind the moisture barrier. He specifically testified that if it were his property, he would tear off all the stone because the condition of the substrate was

16

unknown, in that damage from water intrusion could not be fully assessed without destructive means.

Burroughs opined that the costs to correct the defects and replace materials with those included in the specifications would be in the range of $250,000 to $350,000, though most likely closer to $350,000 plus a 15% contingency for potential damage done to otherwise proper work in the process of making the corrections. This amount included but was not limited to: $75,000 to demolish the roof, redo the decking, and replace the roof; $15,000 – $20,000 to replace all of the stone façade, including redoing the moisture barrier; $100,000 to remove and replace all the windows because they could not be repaired; $15,000 to install moisture-resistant sheetrock in the garage; $10,000 – $15,000 to correct the front gable and dormer; and $2,000 – $3,000 to correct the exposed anchor bolts.

### *Rafael Lara Testimony*

Mr. Lara testified on behalf of himself and the company and was qualified and accepted by the court as a construction expert. He testified that he had been a licensed contractor since 2010, approximately 98% of his work was residential and 90% of the residential work was custom homes. He further testified that he had built between 140 and 150 homes since being licensed, and he also had four years of university training in construction management, though he had not obtained a degree in that curriculum. Also, other than one dispute in which he still completed the project, he has had no significant complaints from customers.

Mr. Lara testified regarding the roof decking thickness. He stated that 7/16" OSB decking is code compliant, and that he has used the product for

17

approximately 98% of his construction jobs without any complaint. He explained that 5/8" decking was unnecessary in this climate because we did not have to be concerned with snowpack. He pointed out that it was also not necessary for the McBrides' home due to the pitch of the roof. He also provided an explanation regarding the use of foil backing, specifically in conjunction with spray foam insulation, as was specified for the McBrides' project. He stated that the spray foam insulation essentially will not bond, that it will get so hot that the foam will shrink and fall off.

Mr. Lara also pointed out other instances in which the specifications were not appropriate, and adjustments were made. He noted that they called for 2500 PSI (pounds per square inch) concrete with fiberglass for the foundation, which he did not recommend and was not used, because a 3,000-3500 PSI should be used on a house foundation, the fiberglass makes the concrete weaker, and some small strands of the fiberglass can stick up through the surface. Also, the specifications called for 3/8" wood paneling, which is plywood, which is not code compliant. Further, 26-gauge galvanized steel was specified, but he opted to use powder-coated aluminum trim coil for the exterior flashing because it was more aesthetically pleasing, and it would not rust easily.

Mr. Lara maintained the position throughout his testimony that he always intended for Lara to make any repairs necessary but was simply prevented from finishing the project.

***Trial Court Findings***

Following trial, the court issued its original judgment and written reasons for judgment on May 8, 2024, awarding the McBrides a total of

$35,400, offset by an award to Lara of $13,540 for its reconventional demand, for a net damage amount to the McBrides of $21,860 plus judicial interest. The court stated that, based on the testimony and exhibits presented, there were multiple errors associated with the building of the home; however, it was unable to determine the alleged damages as set forth by the McBrides due to the lack of evidence supporting the damage claims as well as several discrepancies between the filings and the evidence entered at trial.

The court referred to the McBrides' argument that they spent $405,345.83 to substantially complete the house albeit with defects, alleging an overpayment of $59,167.98, yet there was no evidence or proof of payment of the amount, only some estimates for work that had not been performed. It pointed out the discrepancy in the claims that work was necessary to repair roof leaks, faulty stonework, windows, insulation, and sheet rock, but there was no proof that any work was actually performed.

The court ultimately found that the McBrides should recover damages for the numerous errors, including Lara's use of 7/16" roof decking versus the specified 5/8" decking, the leaks in the laundry room and dining room, the dormer being off center in the office, and the windows having issues and closing too tightly. Accordingly, the court awarded damages to the McBrides in the amounts of $10,000 for the faulty stone façade, $12,500 for the front elevation/dormer damage, $400 for window sash replacement, $7,500 for drywall in the laundry room and dining room, and $5,000 for installing the incorrect roof decking. The court also found that Lara was

entitled to recover the unpaid invoice amount of $13,540, noting it was not a suit on an open account and Lara was not entitled to attorney fees.

Both parties filed motions for new trial. After a hearing on the motions, the trial court found grounds to reconsider the previous judgment and issued its second judgment and written reasons for judgment on October 24, 2024. The court reduced the total award to the McBrides by $13,500, and reduced Lara's award by $3,800, resulting in a net award to the McBrides of $12,160 plus judicial interest. It found that the previous award of $10,000 for the stone veneer was excessive and instead awarded $1,500 for repair. It also reduced the $7,500 amount for drywall in the laundry room and dining room to $2,500 based on the arguments that the actual repair costs would be much less because the affected area was relatively small. As for the reduced amount due to Lara, the parties agreed and the court recognized that the McBrides had paid separately for the septic system installation, so the invoice amount should have been $3,800 less.

The McBrides filed a devolutive appeal.

## DISCUSSION

### *Admissibility of Recorded Telephone Conversation*

The McBrides argue that the recorded phone conversation between Jackson and Mr. Lara should not have been considered, because it did not serve to impeach anything that Mr. McBride said. They explain that Mr. McBride testified about what Jackson observed and commented on at his meeting with Jackson and Hipp, not about the telephone conversation that occurred the day after the meeting. The McBrides also claim that the recorded conversation was not admissible evidence, because it was not

20

considered a "present sense impression" since Jackson's statements about recollections of impressions made the day prior do not qualify. In addition, the McBrides assert that they were not treated with fundamental fairness, because they did not have the right to cross-examine the deceased Mr. Jackson as a witness, even though Lara was able to cross-examine Mr. McBride.

Lara points out that the recording of Jackson's statements describing the inspection and his conversation with Mr. McBride at their meeting is trustworthy, as it is an accurate and very clear recording that was authenticated by Lara at trial. Further, because Jackson had passed away prior to trial, there was no way for Lara to adduce other admissible evidence other than to cross-examine Mr. McBride and question Hipp at trial, as was done. The McBrides also acknowledged that they received prior notice of the recording long before the trial.

Lara argues that the content of the recording was admissible solely to impeach Mr. McBride's testimony regarding the conversation he had with Jackson, which had been allowed over Lara's objection, because Mr. McBride's version of what Jackson said during the inspection differed so greatly from what Jackson relayed to Mr. Lara in their telephone conversation. Lara claims the evidence did not constitute hearsay because it was not offered to prove the truth of the matter asserted but to disprove Mr. McBride's testimony. La. C.E. art. 801(C).

The trial court is granted broad discretion in its evidentiary rulings, which will not be disturbed on appeal absent a clear abuse of discretion. *Succession of Moore*, 54,338 (La. App. 2 Cir. 5/19/22), 339 So. 3d 12, *writ*

21

*denied*, 22-00973 (La. 10/4/22), 347 So. 3d 859; *State v. Smith*, 54,489 (La. App. 2 Cir. 6/29/22), 342 So. 3d 1108; *Fields v. Walpole Tire Serv., LLC*, 45,206 (La. App. 2 Cir. 5/19/10), 37 So. 3d 549, *writ denied*, 10-1430 (La. 10/1/10), 45 So. 3d 1097. Evidentiary rulings are subject to review for abuse of discretion. *State v. Willis*, 55,165 (La. App. 2 Cir. 6/28/23), 367 So. 3d 948.

At trial, a party must make a timely objection to evidence that party considers to be inadmissible and must state the specific ground for the objection. La. C.E. art. 103(A)(1); La. C.C.P. art. 1635; *Smith, supra*. On appeal, this court must consider whether the complained of ruling was erroneous and whether the error affected a substantial right of the party. *Smith, supra*; *Fields, supra*. The determination is whether the error, when compared to the record in its entirety, has a substantial effect on the outcome of the case, and it is the complainant's burden to prove. *Smith, supra*. If there is no substantial effect on the outcome, then a reversal is not warranted. *Id.*; *Fields, supra*; *Crisler v. Paige One, Inc.*, 42,563 (La. App. 2 Cir. 1/9/08), 974 So. 2d 125.

Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial, ordered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(A)(1) and 801(C); *Smith, supra*. Generally, an out-of-court statement is inadmissible as hearsay. *Smith, supra*; *State v. Cousin*, 96-2976 (La. 4/14/98), 710 So. 2d 1065. Hearsay evidence is inadmissible except as specified in the Louisiana Code of Evidence or other legislation. La. C.E. art. 802; *Smith, supra*.

22

Hearsay evidence can be used as impeachment evidence. La. C.E. art. 607(D) states in pertinent part:

> D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
>
> (1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
>
> (2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.

The Louisiana Supreme Court has recognized that La. C.E. art. 607(D)(2) permits the introduction of a prior inconsistent statement or evidence otherwise contradicting a witness' testimony, even though it is inadmissible hearsay, for the limited purpose of attacking the credibility of the witness. *Smith*, *supra*; *Cousin*, *supra*. The admissibility of extrinsic evidence to impeach the credibility of a witness, however, is subject to the relevancy balancing test of La. C.E. art. 607(D)(2), which requires the court to determine whether the probative value of the evidence on the issue of credibility is substantially outweighed by the risk of undue consumption of time, confusion of the issues, or unfair prejudice. *Smith*, *supra*; *State v. Juniors*, 03-2425 (La. 6/29/05), 915 So. 2d 291; *Cousin*, *supra*.

The McBrides appear to argue that the phone call between Jackson and Lara was not "evidence contradicting the witness' testimony" per La. C.E. art. 607(D)(2), because Mr. McBride testified about the statements made to him by Jackson during their meeting, not about anything discussed between Jackson and Mr. Lara during their phone conversation. The trial

23

court admitted the entire phone call as extrinsic evidence to contradict Mr. McBride's testimony, an allowed exception per La. C.E. art. 607(D)(2). The call included, among other discussions, Jackson's statements to Mr. Lara about what Jackson had told Mr. McBride during their meeting the previous day. It is unclear what portions of the phone call the trial court did or did not consider, but the court referenced its ability to distinguish what was relevant.

Mr. McBride testified as to what Jackson said to him during their meeting regarding various issues with the project. The phone call, at least portions thereof, concerned the same *content* – what Jackson said to McBride during their meeting. It was reasonable to determine that the content of the phone call contradicted the content of Mr. McBride's earlier testimony; thus, it was within the trial court's discretion to admit the phone call as impeachment evidence.

### Lara's Qualification as an Expert

The McBrides claim that Mr. Lara should not have been allowed as an expert witness because he lacked basic qualification. They also claim that the record in this case alone – the shoddy construction and failures to follow plans and specifications – showed that Mr. Lara lacked credibility as an expert. They claim that his skill is highly in question, his experience could not be objectively established, and he did not establish how he had any special knowledge.

The McBrides further argue that Mr. Lara should not have been allowed as an expert due to bias, because having the self-interest of a party in the matter casts doubt on the ability of Mr. Lara to be able to assist the

court with an opinion. They refer to this Court's decision in *Dartlone v. La. Power & Light Co.*, 33,597 (La. App. 2 Cir. 6/21/00), 763 So. 2d 779, 787, as well as the Fourth Circuit's decision in *Safeguard Storage v. Donahue Favret Construction*, 09-0344 (La. App. 4 Cir. 5/27/09), 13 So. 3d 244, 246, *writ denied*, 09-1413 (La. 9/16/09), 17 So. 3d 382, which reference that "an expert is not a party."

The facts and holding in *Dartlone*, *supra*, are not comparable to this case. The City of Monroe retained Brooks, an electrical engineer who had previously been retained as an expert in electrical engineering and safety by a separate defendant who was later released from the suit. The trial court reversed its original decision that there had been no conflict from Brooks' prior association from the released defendant. *Id*. This Court reversed that holding, explaining that the fact that Brooks had been an expert for the released defendant did not equate to his being a representative of that party, and there is no presumption that an expert is adverse or hostile to anyone. *Id*. This Court did *not* hold that a party could not also be considered an expert. The Fourth Circuit in *Safeguard Storage*, *supra*, clarified that the *Dartlone*, *supra*, holding represented that, once a party has declined the future services of an expert, another party involved in the litigation is free to retain him for consultation.

Mr. Lara testified as to his knowledge, skill, experience, training, and education, and was approved by the trial court as an expert in construction. La. C.E. art. 702(A) provides:

> A. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

25

(1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) The testimony is based on sufficient facts or data;

(3) The testimony is the product of reliable principles and methods; and

(4) The expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Case law supports that a party can act as an expert witness. The fact that a witness is a party, or an employee of a party, does not preclude his qualification as an expert, because the potential bias of the witness may be explored on cross-examination. *O'Brien v. Remington Arms Co.*, 601 So. 2d 330, 336 (La. App. 2 Cir. 1992), *writ denied*, 604 So. 2d 1003 (La. 1992); *Harrington v. Velinsky*, 567 So. 148 (La. App. 2 Cir. 1990); *Ealy v. Bill Allen Dodge, Inc.*, 466 So. 2d 52 (La. App. 2 Cir. 1985).

### *Damage Amounts*

The McBrides claim that "damages are owed due to nonperformance or delayed performance in the context of home construction," citing *Thomas v. Housing La. Now. L.L.C.*, 24-0063 (La. 3/21/25), 403 So. 3d 570. They claim that they are not required to prove the exact cost of repairs in order to recover, citing the holdings in *Spurrell v. Ivey*, 25,359 (La. App. 2 Cir. 1/25/94), 630 So. 2d 1378, and *Greene v. Fox Crossing, Inc.*, 32,774 (La. App. 2 Cir. 3/1/00), 754 So. 2d 339, 344, *writ denied*, 00-0944 (La. 5/26/00), 762 So. 2d 1108, that "when damages are insusceptible of precise measurement, much discretion is left to the trial court for the reasonable assessment of these damages." However, the McBrides make a seemingly

26

contradictory claim that the trial court "not only abused its discretion, but it was legal error to treat this case like a tort and just throw numbers out and then change those numbers arbitrarily."

Both the McBrides and Lara refer to this Court's holding in *Mount Mariah Baptist Church, Inc. v. Panell's Associated Electric, Inc.*, 36,361 (La. App. 2 Cir. 12/20/02), 835 So. 2d 880, *writ denied*, 03-0555 (La. 5/2/03), 842 So. 2d 1101, as a basis for their respective arguments regarding damages. In *Mount Mariah*, the plaintiff church, Mount Mariah, hired Pannell's, a licensed contractor, to renovate their existing building and add a new building. Due to a dispute regarding who was to pay the architect, the plans were never completed, and Pannell's had to consult directly with church representatives regarding the lack of specificity in the plans. Numerous oral changes were made by Mount Mariah without paying for change orders, which were implemented by a third-party unlicensed contractor without consultation with Pannell's. Mount Mariah presented Pannell's with bills for the changes that had been made that were neither included in the plans nor approved by Pannell's, which Pannell's would not agree to pay. At that point, Mount Mariah ordered Pannell's off the job.

Mount Mariah filed suit against Pannell's for breach of contract, claiming that it had failed to complete the renovation and construction in accordance with the design and specifications, failed to pay invoices, and departed from design for the work resulting in extensive additional work to meet fire code regulations. The trial court ultimately found that Mount Mariah was entitled to damages for several deficiencies in materials and construction, which were itemized by the court, reimbursement for several

27

liens against the property, a credit for the cost of a metal roof included in the specifications, and a credit to complete the project. The trial court awarded damages to Mount Mariah of $183,823.04, noting that the project cost more than anticipated, the church was not satisfied with the quality of the work, and some of the labor and materials were not paid for by Pannell's. The court also found that Pannell's was entitled to an offset of $35,203.00, resulting in a net judgment to Mount Mariah of $148,620.04.

This Court held in *Mount Mariah*, *supra*, among other things, that (1) the evidence supported the finding that the contractor breached the contract and was liable for damages; (2) the trial court acted within its discretion in awarding $42,500 for repairs stemming from poor workmanship, $33,000 for the cost of completing the construction, and $14,300 for the difference between the metal roof envisioned in the plans and the cheaper asphalt roof actually installed; and (3) the trial court abused its discretion in awarding damages for design-related defects. The damages awarded to Mount Mariah were reduced by $20,000 from a duplicate award for finish problems such as drywall and trim, and another $6,000 for repair of the *porte cocheres,* because there was nothing in the record to show that the roof sagging was the result of poor workmanship. *Id*.

La. C.C. art. 2769 provides:

If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.

*Id*. A contractor is liable for damages if it is shown that he did not possess the necessary skill, efficiency or knowledge, or did not exercise ordinary care in performing work and is liable for losses, which the owner suffered

28

because of the contractor's non-compliance with the contract. *Id*. An owner seeking to recover from a contractor bears the burden of proving: (1) both the existence and nature of the defects; (2) that the defects were due to faulty materials or workmanship; and (3) the cost of repairing the defects. *Id*.

Under Louisiana law, a building contractor is entitled to recover the contract price even though defects and omissions are present when he has substantially performed the building contract. *Id*. "Substantial performance" means that the construction is fit for the purposes intended despite the deficiencies; this is a question of fact for the trial judge. *Id*. at 888, *citing Mayeaux v. McInnis*, 00-1540 (La. App. 1 Cir. 9/28/01), 809 So. 2d 310, *writ denied*, 01-3286 (La. 3/8/02), 810 So. 2d 1164. Factors to be considered in concluding a contractor has provided substantial performance include the extent of any defect or nonperformance, the degree to which any such nonperformance has defeated the purpose of the contract, the ease of correction, and the use or benefit to the owner of the work already performed. *Mount Mariah*, *supra*.

A factfinder is free to accept or reject the conclusions of an expert witness. *State v. D.D.*, 18-0891 (La. App. 4 Cir. 12/27/19), 288 So. 3d 808, *writ denied*, 20-00158 (La. 5/26/20), 296 So. 3d 1063. The trier of fact should evaluate the expert testimony by the same rules which are applicable to other witnesses and the trial court is not bound by expert testimony. *Kennedy v. Thomas*, 34,530 (La. App. 2 Cir. 4/4/01), 784 So. 2d 692.

Where factual findings are pertinent to the interpretation of a contract, those factual findings are subject to the manifest error standard of review. *Id*. The trial court's findings of fact are entitled to great discretion. *Rosell v.*

*Esco*, 549 So. 2d 840 (La. 1989); *Spurrell*, *supra*. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or plainly wrong. *Arceneaux v. Domingue*, 365 So. 2d 1330 (La. 1978); *Spurrell*, *supra*. The trial court's discretion is premised largely on its ability to see and hear the witnesses and to make credibility determinations. *Canter v. Koehring Co.*, 283 So. 2d 716 (La. 1973); *Spurrell*, *supra*. However, the manifest error rule applies both to testimonial and documentary evidence. *Virgil v. American Guarantee & Liab. Ins. Co.*, 507 So. 2d 825 (La. 1987); *Spurrell*, *supra*. Under this standard, when reviewing a trial court's findings of fact, the role of the Court of Appeal is not to determine whether the lower court was right or wrong but instead whether its conclusions were reasonable. *Stobart v. State DOTD*, 617 So. 2d 880 (La. 1993); *Lang v. Sproull*, 45,208 (La. App. 2 Cir. 4/28/10), 36 So. 3d 407. Reasonable evaluations of credibility and inferences of fact should not be disturbed on review where there is conflicting testimony. *Spurrell*, *supra*.

The standard for reviewing the award of damages for breach of contract is whether the trial court abused its discretion. *Id*.; *Storey v. Weaver*, 49,027 (La. App. 2 Cir. 5/14/14), 139 So. 3d 1079. La. C.C. art. 1999 provides:

> When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages.

An appellate court should rarely disturb an award for general damages. *Hae Woo Youn v. Maritime Overseas Corp.*, 623 So. 2d 1257 (La. 1993); *Spurrell*, *supra*. Only if an award is first found to be inadequate or

excessive on the facts of the particular case may the appellate court refer to the awards in "similar" cases. *Reck v. Stevens*, 373 So. 2d 498 (La. 1979); *Spurrell*, *supra*.

Lara asserts that, although it didn't appeal due to the standard of review, that it disagrees with the court's finding that the McBrides carried their burden of proof to satisfy any damage award as set forth in *Mount Mariah*, *supra*, as well as in *Lang*, *supra*. Lara further claims that it substantially performed the contract up to the point of termination and is entitled to the unpaid invoices.

The court ultimately awarded damages to the McBrides for the following: $1,500 for the stone veneer repair; $12,500 for the front elevation/dormer damage; $400 for window sash replacement; $2,500 for drywall in the laundry room and dining room; and $5,000 for installing the incorrect roof decking. It awarded an amount of $9,740 to Lara for unpaid invoices. There was little dispute that there were at least some disrepairs for the stone veneer and windows, there had been leaks at some point requiring eventual repair to the laundry room/dining room drywall, and the roof decking installed was not what was stated in the specifications. Lara claims it already repaired the issues with the front elevation and dormer, though the McBrides still claim it was not constructed according to the plans.

The court assessed the credibility of all the witnesses, lay and expert, drawing inferences from their testimony, and made a reasonable factual determination that there were numerous errors in the construction, specifically those items for which damages were assessed. However, it also found that it "has not been able to determine the alleged damages as set forth

by the Plaintiffs," presumably as to the repairs they allege were made, since no invoices were submitted to substantiate those amounts.

The court heard testimony from Mr. McBride regarding the McBrides' claims of multiple problems during the construction process and the amounts they paid for alleged necessary, but no invoices or receipts were submitted to support those claims. The McBrides also had Burroughs testify on their behalf, who had inspected the home and provided a report regarding certain deficiencies. Burroughs opined that the costs to correct the defects noted in his report and to replace materials with those included in the specifications would be approximately $350,000, essentially what it cost to originally build the entire home. Burroughs was not a construction expert qualified to provide opinions on what should be done to correct any alleged defects. He was only able to opine on what it would cost *if it were necessary* to make certain repairs or replacements, which was unsupported by any other testimony or evidence and strongly contradicted by other testimony and evidence in the record. The notion that a roof should be completely replaced simply because the decking size differed from specifications was neither supported by the record nor by case law, given this Court in *Mount Mariah*, *supra*, upheld simply a credit for the difference between the cost of a metal roof that had been specified and an asphalt shingled roof that was applied.

Mr. Lara was qualified as a construction expert and explained all alleged defects and the appropriate remedies. He also testified on his own behalf, repeatedly asserting that he would have completed the job satisfactorily had he not been prematurely removed from the project, and

32

most of the alleged defects were simply "punch list items" that would have been completed at the end of the project. Lara provided other witnesses such as their project manager, bookkeeper, the architect, the window representative, and the bank representative, as well as evidence impeaching testimony attempting to corroborate the McBrides' claim that a third-party contractor was in agreement with their claims.

The trial court acted well within its discretion in finding that only the defects stated in the judgment warranted an award of damages. Further, it did not abuse its discretion in awarding the respective damage amounts. The trial court acted within its discretion and made a reasonable assessment of damages in light of the scarcity of invoices and receipts and the fact that there were only vague references throughout the record as to what it may cost to repair the defects it found to have existed.

## CONCLUSION

For the foregoing reasons, we AFFIRM the trial court's judgment. All costs of this proceeding are to be assessed to the McBrides.

**AFFIRMED**.